# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Tony Marks Racing, LLC,                                  Case No. 3:14CV1568

        Plaintiff

        v.                                                        **ORDER**

VR–12, LLC, et al.,

        Defendants

This is a breach-of-contract suit arising out of an agreement to sponsor a racecar.

The plaintiff, Tony Marks Racing, LLC (TMR), is the owner of the "Number 12" Dodge racecar, which competed in the Automobile Racing Club of America's (ARCA) 2011 racing series.

TMR alleges that it entered a sponsorship agreement with the defendants – VR–12, LLC, which produces a radiator coolant additive called VR–12; Freezetone Products, Inc., the company that distributes VR–12; and Louis Latour, a Florida resident who owns VR–12 and Freezetone. According to TMR, the defendants agreed to pay TMR $50,000 per race – for a total of $950,000 over the nineteen-race season – in exchange for TMR making VR–12 and Freezetone the "lead sponsor" of the Number 12 racecar. TMR also claims that Latour personally guaranteed his companies' obligation to TMR.

After the defendants allegedly breached the contract by paying TMR only $50,000, TMR sued for breach of contract, equitable accounting, and promissory estoppel.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). (Doc. 19 at ¶¶1–12).

Pending are the defendants' motions for summary judgment. (Docs. 40, 44, 47). For the reasons that follow, I grant Freezetone's motion in its entirety, grant Latour's motion in part and deny it in part, and grant VR–12's motion in part and deny it in part.[1]

**Background**

**A. Origins and Terms of the Sponsorship Agreement**

The parties have offered conflicting accounts of both the origins of the sponsorship agreement and its terms. It is these conflicts that prevent entry of judgment as a matter of law for Latour and VR–12.

**1. Plaintiff's Evidence**

According to the affidavit of Tony Marks, an Ohio resident who owns TMR, "Latour came to Ohio in January of 2011 to discuss the sponsorship arrangement[.]" (Doc. 19–1 at 21–22).

During that visit, Marks and Latour, who at the time was acting "in his personal, and representative capacity on behalf of Freezetone and VR–12," "agreed upon and concluded a sponsorship agreement." The agreement, plaintiff alleges, provided that "TMR was to be paid $50,000 per race for the entire 2011 19 race ARCA race season[.]" (*Id.* at 22).

The agreement required TMR to use its best efforts to persuade ARCA to announce the sponsorship at an upcoming race in Daytona, Florida. (*Id.*). But ARCA refused to make the announcement unless Latour would meet with ARCA representatives and "confirm his understanding and backing of the magnitude of this sponsorship commitment." (*Id.*). When Latour met with the ARCA representatives, he "confirmed . . . that he, Freezetone and VR–12 were

---

[1] Because TMR has withdrawn its accounting claim against each defendant, I will grant summary judgment to the defendants on that claim.

committed as primary sponsors or [*sic*] the Tony Marks Racing # 12 ARCA race car for the full 19-race" season. (*Id.* at 23).

Marks told a rather different story at his deposition.

He testified that he first spoke with Latour by telephone in December, 2010. (Doc. 57–18 at 76). Marks and Latour then had multiple phone conversations about doing "future business together[.]" (*Id.* at 77).

In mid-January, 2011, Marks met Latour in Daytona, Florida, but they did not really discuss doing business together. (*Id.* at 69, 70). Rather, all talk about a potential sponsorship was between Latour and Rick Bailey, then the Vice-President of Sales and Marketing for Tony Marks Trucking, Inc., an affiliate of TMR. (*Id.* at 69, 72; Doc. 41–3 at ¶3).

Shortly after Marks's trip to Daytona, Latour traveled to Napoleon, Ohio, where TMR's facilities are located. (Doc. 57–18 at 82). Latour toured the grounds with Marks and Bailey, but they did not come to an agreement. (*Id.* at 83).

Marks made a second trip to Daytona in February, 2011, where he attended the inaugural race of the 2011 ARCA racing series. Before arriving in Florida, however, Marks and Latour had reached "an agreement . . . for a primary sponsor, VR–12, for the entire season." (*Id.* at 85). Marks explained that he and Latour had made the agreement "by phone and also confirmation in person in Daytona by Luis." (*Id.*).

Marks later clarified that it was not he but Bailey who had negotiated the contract:

Q: [I]s it your testimony that the negotiation of the sponsorship agreement was primarily between Rick Bailey and Mr. Latour?

A: Yes.

3

> Q: And the communications that were had were then communicated to you by Mr. Bailey?
>
> A: Yes.
>
> Q: So the information that you had with regard to the terms of the sponsorship agreement came from Mr. Bailey?
>
> \* \* \*
>
> The Witness: Yes

(*Id.* at 88).[2]

According to Marks, the sponsorship agreement concerned the "title sponsor" or "primary sponsor" of the Number 12 racecar. (Doc. 57–18 at 41–42).

He explained that those interchangeable terms refer to the entity that "covers the operating expenses of a race team . . . for an agreed term." (*Id.* at 42). In exchange for its financial support, the sponsor (usually a corporate entity promoting its brand or a specific product) gets to place its logo on the racecar, the driver's uniform, pit-row banners, and other gear and equipment. (*Id.* at 44–45).

As a result of the sponsorship agreement, Marks testified, VR–12 became TMR's "primary sponsor" for the full 2011 ARCA racing season. (*Id.* at 42).

### 2. Defendants' Evidence

Latour agreed that he visited Ohio in January, 2011, but he maintained that "the oral Sponsorship Agreement was not reached" on that occasion. (Doc. 41–2 at ¶13). Latour made a second visit to Ohio (he did not specify when), but the purpose of that second trip was "to visit a racetrack," not negotiate a sponsorship. (*Id.* at ¶19).

---

[2] Marks also acknowledged that the sponsorship agreement was an oral contract, and that there are no writings documenting the terms of the contract or the parties' assent thereto. (*Id.* at 49).

Latour denied that he entered into any agreement on behalf of himself, VR–12, and/or Freezetone with TMR "prior to February 12, 2011[.]" (*Id.* at ¶14). He also testified that he, personally, "was not a party to the oral sponsorship agreement[.]" (*Id.* at ¶6).

Latour and the other defendants concede, however, that there was a sponsorship agreement between TMR and VR–12.[3]

According to the defense, "the extent of VR–12's financial commitment to Plaintiff was to pay a total of $50,000 for its sponsorship role." (Doc. 48 at ¶6). This sponsorship was to last only for the first seven races (the first race was on February 12 and the seventh was on June 11), rather than the entire racing season. (Doc. 57–3 at 45–46). In support, defendants point to a letter that Bailey, purportedly acting on behalf of TMR, prepared and signed on January 20, 2011. (Doc. 48–2 at 1). According to Bailey's letter:

- the only parties to the sponsorship agreement were TMR and VR–12;

- the sponsorship would last for only seven races, "unless extended prior to the ending date"; and

- VR–12 would pay TMR $50,000.

(*Id.*).[4]

---

[3] A notable omission in the defendants' briefs is the lack of any discussion of how this sponsorship agreement came to be.

[4] TMR argues at length that defendants are not entitled to summary judgment because Bailey's testimony, on this point and others, is incredible. (*E.g.*, Doc. 57 at 18). Although I of course cannot make credibility findings on summary judgment, *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008), the credibility of Bailey's testimony will be a ripe area for the jury's consideration. It appears that, unbeknownst to Marks, Bailey was working simultaneously for TMR and either VR–12 or Freezetone in late 2010 or early 2011. Latour, moreover, seemed to characterize what Bailey was doing as "two-timing" Marks. (Doc. 57–3 at 109). When Marks discovered this, he fired Bailey. A jury could therefore entertain some doubt that Bailey's letter was a faithful account of the actual terms of the sponsorship.

**B. Performance**

According to the defense, "VR–12 paid [TMR] $25,000 on February 4, 2011[.]" (Doc. 48 at ¶10). On March 4, VR–12 made a second payment of $25,000 to TMR. (*Id.*).

In February, 2011, Marks and Latour made a joint appearance at the Daytona International Raceway to announce VR–12's sponsorship of TMR. (Doc. 57–3 at 118–21; Doc. 58–18 at 46–47). Moreover, TMR affixed the VR–12 logo to the Number 12 car and its drivers' uniforms. (Docs. 57–6, 57–7, 57–8, 57–9, & Doc. 57–10). The Number 12 car displayed the VR–12 logo for races on April 15, May 15, May 22, June 4, June 11, June 17, and July 16. (Doc. 48 at ¶16).

In contrast, it is undisputed that Latour's name never appeared on the Number 12 car. (Doc. 57–18 at 95).

Asked whether "the word 'Freezetone' ever appear[e]d on any of [TMR's] cars," Marks said he could not recall. (*Id.*). Nor could Marks remember if Freezetone's name or logo appeared on the TMR racing jumpsuits, pit banners, or pit-crew t-shirts. (*Id.* at 95–96). In fact, there is no evidence in the record depicting the Freezetone name or logos on the Number 12 car, the drivers' uniforms, or the advertising and promotional materials that TMR created.

**C. Breach**

As mentioned above, TMR placed the VR–12 logo on the Number 12 racecar for the first eight races of the 2011 season. (Doc. 48 at ¶16). However, TMR received no further payments from the defendants after the initial $50,000.

"[D]ue to lack of payment from VR–12," Marks and TMR struggled to enter the Number 12 car in the ARCA race in Brooklyn, Michigan on June 17, 2011. (Doc. 57–18 at 52). Marks testified

6

that it was only because TMR found a separate sponsor for that race – an entity called Mad Croc, which agreed to sponsor the Number 12 car for $75,000 – that the car could compete at all.

### D. Earlier Proceedings

After TMR filed this suit in July, 2014, the defendants moved to dismiss the case for lack of personal jurisdiction and transfer the matter to the U.S. District Court for the Southern District of Florida. I agreed that plaintiff's jurisdictional allegations were implausible under *Iqbal/Twombly*, but granted leave to file an amended complaint. *Tony Marks Racing, LLC v. VR–12, LLC*, 2014 WL 7175229 (N.D. Ohio).

Plaintiff filed an amended complaint, and I overruled defendants' motion to dismiss for want of jurisdiction. *Tony Marks Racing, LLC v. VR–12, LLC*, 2015 WL 3892553 (N.D. Ohio).

### Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

### A. VR–12's Motion

VR–12 argues that it is entitled to summary judgment because TMR's breach-of-contract and promissory-estoppel claims are "not supported by the record evidence." (Doc. 47–1 at 9).

According to VR–12, the evidence establishes that "the extent of VR–12's financial commitment to Plaintiff was to pay a total of $50,000 for its sponsorship role." (*Id.* at 9–10). To support this argument, VR–12 points to certain evidence in the record that, in its view, is inconsistent with TMR's claim that the sponsorship agreement covered the entire 2011 racing season. That evidence includes: 1) Marks's failure to respond to an email from Rick Bailey characterizing VR–12's second $25,000 payment as the "final payment"; 2) TMR's continuing to place the VR–12 logo on the Number 12 car, even though it received no further payments beyond the first $50,000; and 3) an email that Marks sent Bailey in June, 2011 asking how Bailey was coming "with the VR–12 agreement." (*Id.* at 11, 13).

All of this evidence shows that a reasonable jury could return a verdict for VR–12.

But it does not answer the only relevant question on summary judgment: does the record, viewed in the light most favorable to TMR, permit a reasonable jury to return a verdict for the plaintiff? The answer to that question is "yes."

Marks testified that the sponsorship agreement was for the entire 2011 season, and that it required VR–12 to pay TMR $50,000 per race. (Doc. 57–18 at 224, 225–27). This testimony, standing alone, is enough to deny VR–12's motion. *Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015) (even in a case "[w]here Plaintiff has presented no other evidence," plaintiff's own testimony is "sufficient to defeat Defendant's motion for judgment").

There is additional evidence, moreover, on which a jury could rely to return a verdict for the plaintiff. For one thing, it is undisputed that the Number 12 car displayed the VR–12 logo after the first seven races of the 2011 season. That provides some support for Marks's claim that the parties' contract was for the entire season, rather than the more limited term that the defendants allege.

For another, Marks testified that when it became clear VR–12 breached the contract by refusing to pay TMR, another company (Mad Croc) paid $75,000 to sponsor the Number 12 car for a single race. A reasonable jury could find that Mad Croc's willingness to pay that figure shows that the fair market value of a single-race sponsorship opportunity is closer to the $50,000 figure TMR seeks, rather than the roughly $7,100 figure ($50,000 over the first seven races) that VR–12 supposedly agreed to.

Because a reasonable jury could find for TMR on its breach-of-contract claim, I deny the motion as to that claim. And because VR–12's argument for summary judgment on the promissory-estoppel claim mirrors its argument on the contract claim – and thus suffers from the same infirmities – VR–12 is not entitled to judgment as a matter of law on that claim, either.

### B. Latour's Motion

Latour makes three arguments in his summary-judgment motion.

First, Latour contends that Ohio's version of the statute of frauds forecloses TMR's breach-of-contract claim as to him because TMR is trying to enforce an oral promise to pay another's debt. (Doc. 40–1 at 8–10). Second, he argues that the record establishes that he never promised to guarantee the sponsorship between VR–12 and TMR. (*Id.* at 11–16). Finally, he contends that, because the statute of frauds bars the breach-of-contract claim, Ohio law forbids TMR from reformulating that claim as an estoppel claim. (*Id.* at 18–20).

9

### 1. Scope of the Contract Claim Against Latour

In its amended complaint, TMR appears to assert two theories under which Latour is liable for breach of contract.

First, TMR alleges that Latour was a party, along with VR–12 and Freezetone, to the sponsorship contract. (Doc. 19 at ¶23) ("Latour negotiated and entered into the sponsorship agreement . . . with [TMR]"); (*see also id.* at ¶¶37, 66). In resolving Latour's arguments, I will refer to this aspect of TMR's claim as the "personal capacity claim."

Second, TMR alleges that "Latour personally guaranteed the Sponsorship Agreement entered into between Plaintiff and Freezestone [*sic*] and/or VR–12." (Doc. 19 at ¶40). I will refer to this aspect of the claim as the "guaranty claim."

### 2. Guaranty Claim

#### i. Statute of Frauds

Both sides agree there is no writing that records Latour's promise to answer for the obligation that VR–12 and Freezetone allegedly incurred to TMR.

Accordingly, Latour argues that his alleged oral guaranty is unenforceable given Ohio's version of the statute of frauds, which states that "[n]o action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person . . . unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith[.]" O.R.C. § 1335.05.

As TMR points out, however, "there are two exceptions to this rule: (1) when the new promisor agrees to become 'primarily liable' on the debt, or (2) when the 'promisor's leading object is to subserve his own business or pecuniary interest.'" *GEM Indus., Inc. v. Sun Trust Bank*, 700

F. Supp. 2d 915, 919 (N.D. Ohio) (Zouhary, J.) (quoting *Wilson Floors Co. v. Sciota Park, Ltd.*, 54 Ohio St. 2d 451, 459 (1978)).

Under the approach the Ohio Supreme Court set out in *Wilson Floors*, *supra*, "the first inquiry is whether the promisor has become primarily liable on the debt owed by another to a third party, in the sense that the original debtor is discharged as to the original creditor." *Trans-Gear, Inc. v. Lichtenberger*, 128 Ohio App. 3d 504, 509 (1998). In this scenario, "the promisor is, in essence, no longer answering for the debt of another" – rather, he is answering for his own debt – "and the Statute of Frauds would have no application." *Id.* at 509–10.

But if the promisor "did *not* become primarily liable, and the original debtor remains liable, then the promise is nothing more than a collateral or secondary promise to answer for the debt of another, and the Statute of Frauds is applicable." *Id.* at 510 (emphasis in original).

In this scenario, the court applies the "leading object" test, which asks whether "the promisor's leading object was to subserve his own business or pecuniary interest." *Wilson Floors*, *supra*, 54 Ohio St. 2d at 459. If the promisor "has a pecuniary interest in the outcome that will result from the promise to pay," the "oral promise to pay the debt of another is not required to be in writing." *Filo v. Liberato*, 987 N.E.2d 707, 716 (Ohio App. 2013).

When a court applies the "leading object" rule "to an oral promise of a person to pay for the debt of a corporation," relevant factors include: "(1) whether the promisor holds an office in the corporation; (2) whether the corporation owes the promisor any money; (3) whether the promisor receives a salary from the corporation; and (4) whether the promisor has an ownership interest in the corporation." 51 Ohio Jur. 3d Frauds, Statute of § 17 (collecting cases).

### (a). Primary Liability for the Guaranty

Here, there is no evidence on which a jury could reasonably find that Latour agreed to be "primarily liable" for the obligation that VR–12 incurred to TMR.

At his deposition, Marks testified that Latour was "the one that personally guaranteed" the sponsorship. (Doc. 57–18 at 95). But Marks offers no evidence to show that Latour obligated himself "in the sense that the original debtor" – VR–12 – "is discharged as to the original creditor" – that is, TMR. *Trans-Gear*, *supra*, 128 Ohio App. 3d at 509.

Accordingly, Latour is entitled to summary judgment on the breach-of-contract claim to the extent that TMR alleges Latour is primarily liable for the guaranty.

### (b). Secondary Liability for the Guaranty

But Marks has introduced enough evidence to permit a jury finding that Latour made "a collateral or secondary promise to answer for the debt" of VR–12, *id.* at 510, and that such promise is outside the statute of frauds because it "subserve[d] his own business or pecuniary interest." *Wilson Floors*, *supra*, 54 Ohio St. 2d at 459.

First, viewed in the light most favorable to TMR, Marks's testimony could support a finding that Latour made an oral promise guaranteeing VR–12's obligation. (Doc. 57–18 at 95) (Latour was "the one that personally guaranteed" the sponsorship); (*id.* at 227) ("And Mr. Latour in the trailer, in the ARCA trailer, with the ARCA reps along with myself said, I'm fully capable" of being TMR's primary sponsor).

Second, a rational jury could find that the promise was "to subserve [Latour's] own business or pecuniary interest."

Despite TMR and VR–12 allegedly having reached terms to sponsor the Number 12 car for the entire ARCA 2011 season, the entity with ultimate authority over the racing series – ARCA – sought Latour's personal assurance that he could cover the obligation. Latour, who was the President and CEO of VR–12 and Freezetone (Doc. 57–3 at 22–23), made the guaranty.

If credited, this evidence would permit a jury to find that Latour made the guarantee only to ensure that VR–12 obtained the sponsorship, and that the sponsorship – which would expose ARCA race attendees and participants around the country to VR–12 – would ultimately benefit the sole owner of VR–12: Latour.

Latour's only response to this argument is that accepting it will mean opening the floodgates of litigation. According to Latour, TMR's argument "turns the Statute of Frauds on its head and necessarily creates personal liability for any owner of a company simply because that person is the owner." (Doc. 70 at 6).

This is simply not accurate. It is not Latour's mere status as the "owner of a company" that precludes summary judgment on statute-of-frauds grounds. It is the fact that his admitted business partner testified under oath that Latour made an oral guarantee of VR–12 and Freezetone's obligation to TMR. In any event, the Ohio courts have already explained why it is appropriate to set aside the statute of frauds in these circumstances:

> Ordinarily, this promise to pay the debt of another is required to be in writing, undoubtedly because it would ordinarily not be apparent why one would undertake to pay a debt one does not owe. However, where it is readily apparent that it is the promisor who will benefit from this seemingly altruistic act, the statute of frauds and its protections need not be invoked.

*Filo*, *supra*, 987 N.E.2d at 715.

Accordingly, fact questions prevent judgment as a matter of law on the breach-of-contract claim to the extent it alleges Latour is secondarily liable for the guaranty.

### ii. Existence of the Guaranty

Latour's contention that the record does not establish that he made a guaranty likewise fails.

To be sure, Latour testified that he did not make the guaranty. (Doc. 41–2 at ¶11). Latour also notes that there are significant inconsistencies between Marks' two accounts of how the parties reached the sponsorship agreement. (Doc. 40–1 at 11–16).

But none of that evidence changes the fact that Marks testified Latour did make a guaranty of VR–12's obligation to TMR. Because this aspect of Latour's motion depends on a one-sided version of genuinely disputed facts, he is not entitled to summary judgment on this basis.

### iii. Promissory Estoppel

Latour argues that he is entitled to summary judgment on the promissory-estoppel component of the guaranty claim because "Ohio law is very clear that a breach of oral contract claim that is barred as a result of the statute of frauds cannot be recast as a promissory estoppel claim." (Doc. 40–1 at 19).

Although that is an accurate statement of Ohio law, *e.g.*, *Olympic Holding Co., L.L.C. v. ACE, Ltd.*, 122 Ohio St. 3d 89 (2009), the statute of frauds does not, as I explained above, foreclose the guaranty claim against Latour.[5]

---

[5] Because Latour did not contest the sufficiency of TMR's evidence on the estoppel claim until his reply brief, I deem these arguments forfeited for purposes of the present decision. *Hunt v. Big Lot Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007).

## 2. Personal-Capacity Claim

As noted above, TMR also claims, entirely apart from its assertion that Latour guaranteed the sponsorship, that Latour was a party to the sponsorship agreement. (Doc. 19 at ¶¶23, 37, 66).

In seeking summary judgment on this claim, Latour again adopts a one-side version of the facts while ignoring the evidence TMR cites in its opposition brief. (Doc. 59 at 9). That evidence, if credited, would establish that Latour, along with VR–12, was a party to the sponsorship contract. (Doc. 57–18 at 224–28) (Marks's testimony that he and Latour personally agreed to the sponsorship).

Given the genuine dispute over Latour's role *vis-a-vis* the sponsorship contract, Latour is not entitled to summary judgment on the breach-of-contract claim to the extent it alleges he was a party to, rather than a guarantor of, that agreement.

## C. Freezetone's Motion

Finally, Freezetone seeks summary judgment on the breach-of-contract and promissory-estoppel claims.

Regarding the former claim, Freezetone argues that there is no evidence that it received any considerations in exchange for its alleged agreement to sponsor TMR. Regarding the latter, the company contends there is no evidence that it made a clear, unambiguous promise to sponsor TMR.

### 1. Consideration

"Consideration is . . . an element necessary for a binding contract, and a complete lack of any consideration is a valid defense to a breach of contract action." *Brads v. First Baptist Church of Germantown, Ohio*, 89 Ohio App. 3d 328, 336 (1993).

According to TMR, Freezetone – along with VR–12 and Latour – sponsored the Number 12 racecar during the 2011 season. (Doc. 19 at ¶¶37, 48).

But at his deposition, Marks testified that VR–12 was the only "primary sponsor" for the 2011 season. (Doc. 57–18 at 42). It is undisputed, moreover, that Freezetone did not obtain any of the benefits a primary sponsor ordinarily obtains: placement of its name or logo on the racecar, the driver's uniforms, pit banners, pit-crew t-shirts, and the like. (*Id.* at 95–96; *see also* Doc. 41–1 at ¶11; Docs. 57–6, 57–7, 57–8, 57–9, & Doc. 57–10).

In these circumstances, there is simply no basis for a jury to find that Freezetone received any consideration – either "a detriment to the promisee or a benefit to the promisor," *Brads*, *supra*, 89 Ohio App. 3d at 336 – for supposedly agreeing to sponsor the VR–12 car. Therefore, the jury could not return a verdict for TMR on its breach-of-contract claim against Freezetone.

### 2. Estoppel

Likewise, there is no evidentiary basis whatsoever for a jury verdict in TMR's favor on its estoppel claim against Freezetone.

"In order to establish a claim for promissory estoppel, a party must establish the following elements: (1) a clear and unambiguous promise was made; (2) upon which it would be reasonable and foreseeable for the party to rely; (3) actual reliance on the promise; and (4) the party was injured as a result of the reliance." *A N Bros. Corp. v. Total Quality Logistics, L.L.C.*, 59 N.E.3d 758, 768–69 (Ohio App. 2016).

Here, TMR has not cited any evidence that Freezetone or anyone acting on its behalf clearly and unambiguously promised to pay TMR any sum of money in exchange for its sponsorship of the Number 12 car.

TMR points only to Marks's testimony that: 1) Latour told him "that the companies . . . are the same, one and the same" (Doc. 57–18 at 95); and 2) he thought "Freezetone is a part of . . .

VR–12," (*id.* at 187). But this evidence establishes only that Marks believed that Freezetone was a sponsor; it does establish that Freezetone made a clear, unambiguous promise to pay for the right to sponsor the Number 12 car.

Accordingly, Freezetone is entitled to summary judgment on TMR's estoppel claim.

## D. Miscellaneous Motions

### 1. Motion to Strike

The defendants have filed an omnibus motion to strike TMR's responses to the their statements of undisputed material facts. (Doc. 72).

As the defense correctly points out, TMR's responses (Docs. 60, 61, 62) do not remotely comply with Fed. R. Civ. P. 56(c)(1). Indeed, they provide no citations to the record that would allow me to determine whether the defendants' statements of undisputed material fact are, in fact, undisputed. Had those submissions been the sum total of TMR's efforts to show that genuine factual disputes preclude entry of judgment for the defendants, I would have deemed the facts alleged by defendants to be undisputed, *see* Fed. R. Civ. P. 56(e)(2), and granted the defense motions in their entirety

But TMR's opposition briefs provided adequate citations to the record that enabled me to conclude that material factual disputes do exist in this case. I therefore deny the defense motion as moot.

### 2. Oral Argument

The defendants have also requested an oral hearing on their motions. (Docs. 46, 49).

Having reviewed the briefs and the pertinent parts of the record, I conclude that oral argument is not essential to the fair and proper resolution of this case.

**Conclusion**

It is, therefore,

ORDERED THAT:

1. Latour's motion for summary judgment (Doc. 40) be, and the same hereby is: (A) granted as to the accounting claim and the breach-of-contract claim to the extent that it alleges Latour is primarily liable for the guaranty; and (B) denied as to the remainder of the breach-of-contract claim and the promissory-estoppel claim;

2. Freezetone's motion for summary judgment (Doc. 44) be, and the same hereby is, granted in its entirety; and

3. VR–12's motion for summary judgment (Doc. 47) be, and the same hereby is, granted as to the accounting claim and denied as to the breach-of-contract and promissory-estoppel claims;

4. Defendants' motions for oral arguments (Docs. 42, 46 & 49) be, and the same hereby are, denied;

5. Defendants' omnibus motion to strike plaintiff's response to defendants' statements of material facts (Doc. 72) be, and the same hereby is, denied as moot; and

6. The clerk shall forthwith set this case for a telephonic status conference to discuss referring the matter to Magistrate Judge Knepp for purposes of settlement discussions.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge